# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| **GEERTSON, LLC, an Oregon** | ) | **Case No.  05-02343-TLM** |
| **Limited Liability Company,** | ) | |
| | ) | |
| **Debtor.** | ) | **MEMORANDUM OF DECISION** |
| | ) | |
| _____ | ) | |
| | ) | |
| **GEERTSON, LLC, an Oregon** | ) | |
| **Limited Liability Company,** | ) | |
| | ) | |
| **Plaintiff/Counterdefendant,** | ) | |
| | ) | **Adversary No. 05-6049-TLM** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **WASHINGTON MUTUAL BANK,** | ) | |
| | ) | |
| **Defendant/Counterclaimant.** | ) | |
| | ) | |
| _____ | ) | |

## I.    INTRODUCTION

Debtor in possession and plaintiff, Geertson, LLC ("GLLC"), filed a

chapter 11 petition on June 16, 2005, commencing Case No. 05-02343-TLM.  It

filed the complaint commencing the instant adversary proceeding, Adv. No. 05-

6049-TLM, on August 12, 2005, against Defendant, Washington Mutual Bank

MEMORANDUM OF DECISION - 1

("Bank").

GLLC's complaint seeks (1) a determination of the nature and extent of the interests of GLLC and Bank in certain real property in Malheur County, Oregon and Owyhee County, Idaho; (2) a recovery by GLLC against Bank on the theory of a preferential transfer prohibited by § 547 of the Bankruptcy Code; and (3) a determination that GLLC is entitled to relief, of an unspecified nature, on the basis of Bank's fraud.[1]  GLLC filed a lis pendens in the real property records of the two counties identified above.[2]

Bank answered the complaint, alleged several affirmative defenses, and asserted a counterclaim addressing claims for (1) GLLC's slander of title, (2) eviction, (3) trespass, and (4) quiet title.[3]

### A.    The nature of the dispute

In extremely abbreviated form, the litigation revolves around the following.

Bank negotiated and entered into a December, 2003 "workout agreement" with its debtor, GLLC, and several related debtors and guarantors on credit facilities in excess of $4,000,000.00.  Under that agreement, certain payments

---

[1]  Adv. Doc. No. 1.  The allegations of fraud do not appear to be in the nature of avoidance of fraudulent transfer as normally advanced in bankruptcy litigation. *See*, *e.g.*, §§ 544(b), 548.  Nor do they clearly appear to assert some independent cause.  Rather, they appear to be general allegations made in support of the first described cause of action.

[2]  Adv. Doc. No. 4.

[3]  Adv. Doc. No. 9.

MEMORANDUM OF DECISION - 2

totaling $1,000,000.00 were to be made in 2004, others totaling $1,000,000 by the spring of 2005, and a final amount in November 2005. The agreement provided that failure to make any such payments would constitute an event of default and enable Bank to proceed with remedies as set out in the agreement and its loan documentation. These remedies included recording certain deeds in lieu of foreclosure that had been granted as a part of the workout. Two of the deeds in lieu concerned GLLC's properties in Idaho and Oregon. A third involved Nevada property, and is not directly at issue in this litigation.[4] Bank in fact obtained the deeds from the escrow established in connection with the workout agreement, and later recorded those deeds in June, 2005.

GLLC alleges that it was defrauded by Bank[5] in connection with the negotiation and execution of this workout agreement. GLLC wants the Court to determine that the agreement (or at least parts of it) and the recorded deeds in lieu of foreclosure are "null and void" as being obtained through fraud, to set aside the

---

[4] The real property in Nevada was apparently held by Phillip and Marilyn Geertson personally. *See*, *e.g.*, Ex. 32 at 6. Thus GLLC is not asserting causes of action against Bank in the instant adversary related to it. However, Bank obtained and recorded the deed in lieu of foreclosure on the Nevada property under the multi-borrower workout agreement. And, as noted in more detail below, Bank thereafter negotiated a proposed sale encompassing the real property in all three States, and advances its motion for preliminary injunction in order to proceed with such a combined sale.

[5] GLLC argues that Bank's counsel participated in the fraud, but has sued only Bank.

MEMORANDUM OF DECISION - 3

same, and to set aside or negate their recording.[6]

Bank denies any fraud occurred, and affirmatively alleges that the workout was a final, complete and fully integrated settlement, enforceable according to its terms.  It further disputes all the various rights to relief GLLC alleges, and asserts a number of affirmative defenses that it believes forecloses any relief.

In its counterclaim, Bank contends that GLLC has, by the filing of the lis pendens, slandered the Banks' title to the Idaho and Oregon real properties.  It asserts a right to damages for that reason and also for trespass, and it seeks the eviction of GLLC.  It further wants a judgment quieting title, including an order requiring the release of the lis pendens.

The matter came before the Court on a motion for preliminary injunction filed by Bank.[7]  Hearings were held on the Motion on December 7, 21 and 23, 2005.

**B.     The nature of the Motion**

By its Motion, Bank seeks entry of "an injunction mandating that [GLLC] remove the lis pendens encumbering the Idaho and Oregon real properties, for an order authorizing [Bank] to sell the real properties free and clear of [GLLC's]

---

[6] GLLC further argues that the obtaining of the deeds and their recording constituted an avoidable preference under § 547(b).  *See* Adv. Doc. No. 1 at 5 (¶ XI).

[7] Adv. Doc. No. 11 ("Motion").

MEMORANDUM OF DECISION - 4

alleged claims and alleged interest, and for an award of attorney fees and costs."[8] Since the Motion seeks an order directing an adverse party to take an act, *i.e.*, that GLLC affirmatively remove its recorded lis pendens, rather than one enjoining it from taking an act, Bank's request is properly characterized as involving a "mandatory preliminary injunction."

The Motion also requests that the Court enter an order "authorizing" Bank to sell the real property. Technically, this does not deal with an injunctiion at all, *i.e.*, it seeks no injunctive relief telling GLLC it cannot take an act or must take an act. Instead, this aspect of the Motion seeks direct Court authorization for Bank to act (to wit, sell the property) notwithstanding the bankruptcy or the adversary litigation.[9]

The Motion was pressed in material part because Bank obtained an offer for the purchase of all three properties (Idaho, Oregon and Nevada) for $3,000,000.00. However, the sale was conditioned on Bank obtaining a Court order authorizing the sale free and clear of the lis pendens and of the claims of GLLC and related parties, all by December 30, 2005.

### C.    The nature of the ruling

The Court took the Motion under advisement on December 23. Later that

---

[8] *Id.* at 2.

[9] Bank's briefing lacks clarity as to the legal basis for this Court entertaining entry of such an order, though Bank appears to see it as subsumed in its prayer for "other equitable relief."

MEMORANDUM OF DECISION - 5

day, it orally entered a decision and advised the parties that the Motion would be denied. While the Court's findings and conclusions were summarized on the record, the Court informed the parties that a more complete written recitation would be provided, and it thus enters this Memorandum of Decision.[10]

In its oral decision, the Court found and concluded that Bank had established a substantial likelihood of success on the merits of the litigation. However, the legal standards for mandatory injunctive relief are high, and include more than just a showing that it is likely that the movant will prevail. The Court found that those standards had not been met, and that the extraordinary relief of a mandatory preliminary injunction was not warranted. Thus, it declined to enter the requested order requiring GLLC to release and remove the lis pendens. The balance of the Motion consequently fell.

## II.    FACTS

This Memorandum of Decision constitutes findings of fact and conclusions of law as required by Rule[11] and is in clarification and support of the Court's orally stated findings and conclusions. However, the facts herein might best be characterized as "preliminary" findings of fact:

When faced with a motion for a preliminary injunction, the Court "is

---

[10]  The preliminary oral ruling was accelerated and made in part given the arguments concerning the impending deadline of December 30, 2005, existing in regard to Bank's sale offer.

[11]  *See* Fed. R. Bankr. P. 9014 (incorporating Fed. R. Bankr. P. 7052).

MEMORANDUM OF DECISION - 6

not required to make any binding findings of fact; it need only find probabilities that the necessary facts can be proved." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984). Accordingly, the facts recited herein are not to be considered final and binding on the rest of the proceedings. Rather, based on the current evidentiary record, the Court concludes they are substantially likely to be proven at trial.

*Faith Ctr. Church Evangelistic Ministries v. Glover*, No. 04-03111, 2005 WL 1220947 (N.D. Cal. May 23, 2005).[12]

The facts found are subject to later revision and supplementation, or might even be superceded by new findings, depending on the entirety of the evidence at trial. Still, it is important to be clear and precise on what the Court has determined on the evidence heard to date. The presentation of evidence over several days of hearing should not be viewed as wasted effort. It was required in connection with the parties' attempts to establish or defeat the idea of the movant's likelihood of success on the merits. Moreover, that evidence remains before the Court and available in the ultimate trial of the matter, without the need for reintroduction.[13]

## A.    The debts, default, and negotiation for forbearance

GLLC is an Oregon limited liability company. Its members include, at a

---

[12]  For ease of reading, the Court will avoid in this Decision to the extent possible conditioning language such as "apparently," "seems to indicate," "tends to show," or the like, even though facts are not as yet finally established.

[13]  An additional point. While a good portion of this evidence on the Motion was documentary, certain critical issues are dependent on testimony. Thus, the Court's findings incorporate the Court's evaluation of the witnesses' credibility, even where no specific discussion of credibility is noted in this Decision, and also incorporates the Court's conclusions about the weight to be afforded testimony.

MEMORANDUM OF DECISION - 7

minimum, Phillip and Marilyn Geertson and a third family member, Steven

Geertson.[14]  GLLC and the Geertsons are collectively engaged in a large scale

farming operation, focusing significantly on growing and marketing seed.

GLLC was one of several related entities and individuals obligated to

Western Bank.[15]  Western Bank was acquired by Bank, the Defendant herein, in

1996.  In the fall of 2001, Bank ceased conducting any activity under the name or

style of Western Bank, and used solely its own name.[16]

In December, 2001, GLLC was in default of its agricultural loan

agreements.  There were six promissory notes involved, with an aggregate

---

[14]  Marilyn Geertson signed the Chapter 11 petition for relief as managing member.  *See*
Case 05-02343-TLM at Doc. No. 1.  She also signed the declarations concerning the schedules
and statement of financial affairs in the same capacity.  *Id.* at Doc. No. 9.  The response to
question 21(b) of the statement of financial affairs shows Marilyn, Phillip and Steve Geertson as
each holding 5% or more of the interests in GLLC.  *Id.*  These three individuals signed material
agreements with Bank on behalf of GLLC.  *See*, *e.g.*, Ex. 7.

[15]  In this Decision, the Court uses "GLLC" when referring to that limited liability
company, now the debtor in possession in Case No. 05-02343-TLM and the Plaintiff in this
adversary.  GLLC, Phillip and Marilyn Geertson individually, and the other related entities acted
and communicated in a collective manner as far as negotiations and discussions with Bank.  In
these situations, Phillip Geertson spoke for the entire group and was the primary individual who
dealt with Bank officers and attorneys.  Depending on context, the Court's use of "Geertson" in
this Decision either identifies Phillip Geertson personally as the actor, or the entire group of
related individuals and entities.

[16]  Geertson testified that a borrowing relationship was formed with Western Bank in the
early 1990's and that, under this relationship, this bank would renew annual operating lines even
though the preceding year's lines were in default.  Geertson and GLLC argued, in this vein, that
Bank had obligated itself to advance operating funds in late 2001 or early 2002, even though the
prior year's line was not paid, but then failed to do so and called the loans, injuring him and
GLLC.  The assertion of a binding or effective obligation to so lend was not proven.  And an
entire series of forbearance and workout agreements were executed after this alleged breach, each
of which asserted a lack of claims and offsets.  Importantly, in each such agreement GLLC
waived any such claims in consideration for other and further accommodations and loans.

MEMORANDUM OF DECISION - 8

principal balance exceeding $4,100,000.00 on December 27, 2001.  Bank agreed

to forebear to January 18, 2002, under an agreement dated December 27, 2001.[17]

GLLC was one of several "borrowers" on the obligations, the others being Phillip

and Marilyn Geertson (individually and doing business as Geertson Seed Farms),

Geertson Farms, Inc., an Oregon corporation, and Paradise Valley Farms, a

Nevada general partnership.[18]  GLLC signed this agreement through its members

Phillip Geertson, Marilyn Geertson, and Steve Geertson, all of whom, along with

other individuals, were also guarantors.[19]

Similar forbearance agreements of limited duration were entered into in

February and March, 2002.[20]  In each of the several agreements, GLLC (and

others) gained relief from impending collection and an extension of the maturity

date on the subject notes, but reaffirmed all the obligations and the security

therefor, and expressly represented that there were no claims, counterclaims,

---

[17]  Ex. 1.

[18]  The nature of the entities is not expressly stated in the December, 2001, forbearance
agreement, Ex. 1, but appears in a later fully executed agreement.  *See* Ex. 7 at 1, and at 11-12
(¶ 10.1).

[19]  Phillip Geertson testified that a Western Bank employee indicated to him in the fall of
2001, that the unpaid 2000 obligations would be "rolled over" and operating financing for 2001
provided, and that in reliance on these representations over $70,000.00 of checks were issued
which bounced.  Then, he stated, small "interim loans" were provided, but not as much as asked
for or needed.  However, the forbearance agreements, starting with Ex. 1 in December, 2001,
foreclosed further debate over those points, as Geertson, GLLC and the others gained additional
time to deal with outstanding debt and, in certain agreements, additional funding as well.  *See
supra* note 16.

[20]  Exs. 2, 3.

MEMORANDUM OF DECISION - 9

defenses or offsets to liability, and waived and released the same.[21]

### B.    The April 2002 agreement, and another default

A comprehensive agreement was negotiated and executed effective April 1, 2002.[22]  In it, GLLC, Geertson Farms, Inc., Phillip and Marilyn Geertson dba Geertson Seed Farms, and Paradise Valley Farms (all as "Borrower"), and Phillip and Marilyn Geertson, Steve and Lisa Geertson, and Douglas and Joann Behrends (all as "Guarantors") agreed that they owed Bank $3,970,874.11 in principal and interest accrued through April 1, 2002.[23]  They agreed that all security for the obligations was effective, and there were no defenses or offsets to this liability or other claims against Bank.[24]  The debts previously existing were thus restructured into five credit facilities (loans and lines of credit) totaling $5,158,851.00 with advances on the lines and loans going to satisfy the prior obligations owed Bank.[25]

---

[21] Further, in Ex. 1 at 5, an additional operating loan of $150,000.00 was made and, in Ex. 3 at 5, an additional loan of $100,000.00 was made.

[22] Ex. 4.

[23] *Id.* at 1-2 (total of amounts in Recitals A through I).

[24] *Id.* at 3-4 (Recitals K through O), 5 (¶ 1.a), and 18.

[25] *Id.* at 5-6 (¶ 2.a).  The restructure included a revolving line of credit for seed sale enterprises of $850,000.00 of which $294,307.66 remained after the partial advance made and applied to prior debt, a $900,000.00 non-revolving line of credit for farm production of which $714,375.00 remained after an advance applied to prior debt, and a $200,000.00 non-revolving line for farm production on which no advance was made.  The undrawn portions of the three lines total $1,208,682.66, bridging the arithmetic gap between the total amount of the restructured obligations of $5.158 million and the existing debt of $3.95 million.

MEMORANDUM OF DECISION - 10

Borrower agreed the debts would mature on March 1, 2003.[26]

The obligations as restructured under the April, 2002 agreement were not paid as agreed or by the March 1, 2003 maturity.[27]  On March 12, 2003, Jerry Bedenbender, Bank's special asset officer on this account, sent a letter to Geertsons noting the outstanding default totaling $4,505,076.98, and pointing out that repayment proposals promised at a February, 2003 meeting had not been yet made.[28]

After phone discussions, Phillip Geertson replied with a May 16, 2003 letter making a "preliminary proposal" that Bank reduce the principal amount of the debt by roughly $1.5 million to $3,000,000.00, which reduced amount would be paid by May 31, 2004.[29]  While the amount was significantly less than the total amount owed, Geertson also offered to provide "deeds in lew [*sic*] of" to Bank which could be exercised by Bank in the event payment by the May, 2004 date did

---

[26]  *Id.* at 5 (¶ 2.a).

[27]  Geertson testified that the agreement, Ex. 4, and the net operating lines available thereunder, provided enough money to produce a seed crop, but not enough to process or market it.  He indicated that he therefore "expected" Bank to roll over the debt, even if not paid, and address it in new 2003 financing.  He admitted, however, that no such obligation to provide further financing was in the agreement.

[28]  Ex. 34.  Bedenbender also noted in this letter and in his testimony that no payments on operating loans had been made from the proceeds of seed sales.

[29]  Ex. 14.

MEMORANDUM OF DECISION - 11

not occur.[30]  He also proposed that as incremental payments were made in certain identified amounts, Bank would release certain personal and real property collateral.

Bedenbender characterized the process of negotiations between Bank and Geertson as addressing three different "agreement" structures.  This was "agreement one" in Bedenbender's mind, and was fundamentally a proposal by which GLLC and Geertson debtors would liquidate and/or refinance with third parties in order to cash out Bank at a discount over a one-year period.

Bank considered this proposal, and negotiations ensued.  A draft agreement was prepared, incorporating several of the terms proposed by Geertson and providing for a payment of $3,225,000.00 by May 31, 2004, at which time deeds in lieu of foreclosure would be released and the remaining debt cancelled.[31]

However, in October, 2003, Geertson rejected this approach.  Geertson testified that the payment dates were a problem, and that he required collateral to be released before the final payment so it could be offered to secure other lenders.  Bedenbender indicated, similarly, that Geertson had indicated to him that he wanted to continue farming, and wished to restructure the proposal.

_____

[30] *Id.*

[31] Ex. 15.  This was but one of many versions of proposed settlement structures and agreements prepared in the process of negotiation over the GLLC and related entity debt.  It was prepared by Bank's counsel, as discussed further below, and was "Version 5" of a possible settlement agreement.

MEMORANDUM OF DECISION - 12

Geertson sent a letter in late October indicating a desire to extend the maturity from May, 2004 to February, 2006, service the obligations through farming, and pay down the debt sufficiently that a refinancing of the balance by 2006 was possible.[32]

Bank had problems with this approach.  It had previously advised Geertson that it would not finance ongoing operations but only consider negotiating a methodology for repayment of all outstanding obligations.  In addition, nothing had been paid toward any of the obligations for an extended period, even though farming had been ongoing.  Bank was not greatly motivated to consider the suggested alternative.  And Geertson was not willing to accept the then outstanding draft agreement.

On November 17, 2003, Bank issued a demand letter through its counsel, insisting on prompt payment to avoid repossession of collateral, foreclosure, and collection litigation.[33]  On December 1, 2003, Phillip Geertson responded to the demand, claimed an ability and desire to repay $2.8 to $3.0 million over 2½ years, again suggested the deed in lieu concept, and asked for a meeting to work out a negotiated solution.[34]

---

[32] *See* Ex. 16.

[33] Ex. 5.

[34] Ex. 6.

MEMORANDUM OF DECISION - 13

### C.    December 2003 negotiations, and another proposed agreement

On December 5, 2003, a meeting was held at the offices of Bank's counsel. Phillip Geertson, certain of his family members, Bedenbender, and two attorneys and a paralegal of Bank attended the meeting.[35]  A rough outline of a potential workout agreement was developed at the meeting.  Bedenbender characterized this as "agreement two."

Under this structure, there would be an initial payment of $100,000.00 in early January, 2004 and payment of an additional $900,000.00 within four months (*i.e.*, by April, 2004).[36]  Another $1.0 million would be paid within a year (by April, 2005).  A final payment would be made in the fall of 2005, yielding a total of $3,225,000.00 in payments.

One of Bank's attorneys, Richard Goodson, was charged with reducing the tentative agreement discussed to a written agreement.  He had prepared the various lengthy and detailed drafts of prior possible settlement agreements between Bank and Geertson/GLLC, *et al.*[37]

---

[35]  GLLC in its pleadings and briefing asserted that this meeting was tape recorded, but failed in any sense to prove this allegation.

[36]  In testimony, Geertson said that he understood the requirement of generating $1,000,000 within 5 months as only a "target" and, if circumstances prevented meeting it, the unpaid amounts would be "rolled-over."  There was no proof that this was ever a component of the negotiations, and the final agreement clearly did not so provide.

[37]  Goodson could identify versions of the draft agreement by reference to his law firm's word processing data in a "footer" to each document.  The Court will refer to these "Versions" by

(continued...)

MEMORANDUM OF DECISION - 14

On December 10, 2003, he provided Geertson/GLLC with "Version 7" of the draft agreement.[38]  This agreement noted a principal outstanding balance of $4,505,076.98 and interest of $135,957.80, which would be consolidated into a new note.[39]  Payments of $100,000.00 and $900,000.00 were required on January 9 and April 30, 2004, respectively.[40]  Payments of like amounts totaling $1,000,000.00 were due on the same days in 2005.[41]  A final payment was due November 30, 2005 and would effectively be $1,225,000.00.[42]

GLLC and the others ("Borrowers") would reaffirm all the outstanding security for the obligations, specifically including the deeds of trust encumbering the Idaho, Oregon and Nevada properties, and the draft agreement reflected Borrowers' intent to sell or refinance Idaho and Oregon property to obtain the funds necessary to perform the agreement.[43]

---

[37](...continued)
number as established by the evidence.  Additionally, Bank's lawyers had the ability to run comparisons between Versions of the document, that would identify the total number of changes made and show the same in a "red-line" format, *i.e.*, with deletions and additions identified.  *See*, *e.g.*, Exs. 18, 19.

[38] Ex. 17.

[39] *Id.* at 1-2 (¶¶ 1.1, 2.1).

[40] *Id.* at 3.

[41] *Id.* at 4.

[42] *Id.* at 4 (¶ 3.1(c)), and 10 (¶ 6.1).

[43] *Id.* at 7-8.

MEMORANDUM OF DECISION - 15

Borrowers also agreed to provide deeds in lieu of foreclosure on the Idaho and Nevada properties, and on the Oregon properties with the exception of 60 acres on which homes and shops were located.[44]  Bank would be entitled to obtain and record the deeds in lieu in the event the total of $3,225,000.00 was not paid by November 30, 2005.[45]

This draft was superseded two days later when Goodson sent to Geertson by facsimile a letter and a red-line copy of Version 8.[46]  This version made changes to the interest accrual calculations,[47] deleted the Home Place as an exception to the properties which would be subject to the deeds in lieu,[48] and changed the scope of the release of collateral that would occur when the payments

---

[44]  *Id.* at 8-10 (¶¶ 5.2, 5.3).  The parties at times characterized this excepted parcel as the "Home Place."  This appears to be but a portion of what is otherwise identified as the "Home Tract" in the appraisal obtained by Bank.  *See id.* at ¶ 5.3 (excepting 60 acres) *and see* Ex. 31 at 17, 21 (describing "parcel #2 - Home Tract" and identifying acreage involved).  In general, there was a lack of clarity regarding the various properties in the presentations.  *Compare*, *e.g.*, Ex. 31 at 24 *with* Ex. B (plat maps of subject parcels).  Part of this appears driven by a question over record ownership of the "Burroughs" parcel at the Home Tract.  *See id.*; *see also* Ex. 31 at 7.  At bottom, though, the open questions do not impact the resolution of the Motion, and can likely be clarified if needed at trial.

[45]  Ex. 17 at 8.

[46]  Ex. 20.

[47]  *Id.* at 1-3.

[48]  *Id.* at 9 (¶ 5.2) and 11 (deletion of ¶ 5.3).  The effect was that a deed in lieu would be taken on the Home Place as well as the other property, though the change to ¶ 4.3 discussed *infra* provided for an early release of the lien on the Home Place.

MEMORANDUM OF DECISION - 16

in January and April of 2004 and 2005 were made.[49]  Version 8, however, still maintained the default provision that triggered the release to Bank of the deeds in lieu upon failure to make the payments called for by November 30, 2005.[50]

This version of the agreement was never accepted or signed.  Bedenbender got a telephone call from Geertson on or about December 15, a few days after the December 12 letter and draft agreement, in which Geertson indicated he found this version unacceptable, at least in part based on some input from "lawyer friends" who recommended against it.

Between the December 15 rejection of what Bedenbender saw as the "agreement two" approach and December 24, he had a long telephone conversation with Geertson, resulting in renewed negotiations over a third modified approach or, in Bedenbender's mind, "agreement three."

Geertson/GLLC *et al* wanted to continue farming.  But the parties knew that Bank was unwilling to provide any additional or operational funding.  Thus it was necessary to structure an approach that allowed for partial release of collateral as payments were made in order to free assets for the borrowers to use as collateral for farm financing with other lenders.  The initial idea was that, after the first $1.0

---

[49] *Id.* at 7-8 (¶ 4.2).  Version 7 had indicated that after payment of this $2.0 million, Bank would release its lien in seed crops, inventory, and equipment and titled vehicles.  Version 8 changed this by striking the release of equipment, but including the release of the lien on the Home Place.

[50] *Id.* at 9-10 (¶ 5.2)

MEMORANDUM OF DECISION - 17

million was paid in April, 2004, Bank would release all crops, accounts receivable and seed inventory.

Bank felt this would be a substantial accommodation to Geertson. As it noted, release of any of the personal property collateral under the earlier agreement versions would have occurred only after $2.0 million in payments were made, which could be as late as April, 2005. Bank also saw Geertson benefitting because he could avoid the need for liquidation of property in order to meet the payment requirements, relying instead on farm income and new secured financing. Bedenbender noted that, in Bank's view, the ability to pay the $1.0 million by April, 2004, appeared reasonable given that the Borrowers had made no payments for some time even though the farming business had continued throughout the period of the negotiations.

But Bank also felt that this approach increased its risk as well. It would still be agreeing to a substantial discount of the total outstanding debt based on $3.225 million being paid by November, 2005, but now it would release substantial collateral and leverage after payment of just the first $1.0 million. A primary motivation for Bank in the deal was the accelerated access to the real property security under the deeds in lieu of foreclosure, which would free it from the need to foreclose, deal with redemption rights, and suffer attendant delay.

Thus Bank wanted to ensure that the deeds in lieu were available in the

MEMORANDUM OF DECISION - 18

event of any default in payments, not just the failure to make the final payment by
November 30, 2005.  It therefore directed a change in the form of agreement to
make the deeds in lieu available on the occurrence of "any default."

On December 24, 2003, Goodson sent a letter by facsimile to Geertson
along with a copy of the revised agreement, Version 9.[51]  This copy of Version 9
was a red-lined or "comparison" copy, which meant that changes from Version 8
were readily identifiable.[52]

In this Version, accounts receivable were added to the list of collateral
(inventory and seed crops) that would be released, and the date of release was
moved from receipt of the April, 2005, payment to the date of receipt of the $1.0
million payment due April, 2004.[53]  It struck the provisions related to borrowers'
intended sale of properties and the "release amounts" therefore, and indicated
instead that upon receipt of the $1.0 million 2005 payment, Bank would release
the Oregon and Idaho properties by reconveying the deeds of trust.[54]

-----

[51]  Ex. 21.

[52]  *Id.*

[53]  *Id.* at 7 (¶ 4.2).  In Version 8, seed crops and inventory would be released but only on
the second $1.0 million payable in 2005.

[54]  *Id.* at 7 (¶ 4.3).  Thus, Bank had security in real property, crops and their proceeds,
inventory, accounts receivable, and equipment.  *Id.* at 4-7 (¶ 4.1).  Upon the 2004 payment of
$1,000,000 the crops, inventory and accounts receivable interests would be released.  *Id.* at 7
(¶ 4.2).  On the 2005 payment of $1,000,000 the Oregon and Idaho real property would be
released.  *Id.* at ¶ 4.3.  That would appear to leave the equipment and the Nevada property as
security for the final fall 2005 payment.

MEMORANDUM OF DECISION - 19

Bank also wanted to ensure that funds from farming operations were not just available but actually used to make the payments, a position driven by lack of prior payments from this source and by the structure of the agreement which released collateral to facilitate continued farming. The agreement therefore required crop proceeds to be in form of checks jointly payable to borrowers and Bank, and that at least 50% of these proceeds remain in an identified account at Bank.[55]

As noted, Bank wanted a change in the default provisions if it was to make these accommodations to Geertson and GLLC. As discussed above, prior versions provided that the deeds in lieu could be obtained and recorded if the November 2005 final payment was not made. Now, under the Version 9 revisions, Bank would release personal property collateral in 2004 and would release the Idaho and Oregon properties upon payment in April, 2005. It thus appears obvious that the deed in lieu trigger in November, 2005 would need to change.[56]

---

[55] *Id.* at 8 (¶ 5.1). While this section did not change greatly from Version 8, it was an important sticking point in the last stages of the negotiations and is thus highlighted here.

[56] GLLC's argument that the parties agreed the sole default triggering the recording of the deeds in lieu would be failure to make the November, 2005, payment makes little sense in context. GLLC does not dispute that the revised agreement provided for potential release of the Idaho and Oregon deeds in lieu in April, 2005. To accommodate GLLC's argument, one would have to assume (a) all three deeds in lieu are granted; (b) the Idaho and Oregon deeds are not reconveyed in April, 2005 because Borrowers fail to make payment but that this default in payment does not allow Bank to record them either; (c) if GLLC failed to make up all payments by November, 2005, the deeds in lieu could be recorded. This approach "motivates" Borrowers to timely pay in April, 2005, but exposes them to no consequence for missing that payment. GLLC's view effectively gives it the ability to slide the required April, 2005 payment to

(continued...)

MEMORANDUM OF DECISION - 20

The default provisions of the agreement were modified in this Version to reflect the change in approach, and stated:

> The Borrowers agree that the Escrow Agent, without additional authorization or instruction from the Borrowers, is authorized and directed upon request from the Bank to immediately deliver to the Bank the Deeds in Lieu of Foreclosure, Estoppel Certificates and any other documents deposited by the Borrowers with the Escrow Agent upon: i) any Event of Default under this Agreement prior to November 30, 2005, or ii) the failure of the Borrower to pay the Bank the total sum of $3,225,000.00 on or before November 30, 2005.

Ex. 21 at 9 (¶ 5.2).[57]

GLLC alleged and argued that this change in the default provision was something Goodson did without Bank's direction or authorization. GLLC also alleged and argued that the change in the default terms was concealed or inserted in a fraudulent and deceitful manner. These allegations were not proven and were specifically and effectively rebutted.

GLLC further alleged in its complaint that the agreement "was changed after being reviewed and approved by all parties."[58] This requires discussion of

---

[56](...continued)
November, 2005.

[57]  As discussed in the text and preceding note, the agreement provided for the deeds in lieu on the Idaho and Oregon properties to be returned if the April 2005 payment was made. *Id.* at 10 (¶ 5.2). A corollary provision addressed the release at the same time of the underlying deeds of trust securing the Oregon and Idaho properties. *Id.* at 7 (¶ 4.3). What would be left for Bank at that point, in addition to equipment collateral, would be the security in and deeds in lieu regarding the Nevada property. *Id.*

[58]  Adv. Doc. No. 1 at 4 (¶ VII).

MEMORANDUM OF DECISION - 21

what occurred after Goodson sent Geertson the December 24 facsimile, and when and how the ultimate execution of the agreement occurred.

### D.       Review of the proposal, and the final Settlement Agreement

Phillip Geertson went hunting on Christmas Day, 2003, with a friend, Lois Hart.  Hart was and is a lawyer.  In the early part of December, 2003, she had discussed with Geertson, in general terms, the financial problems faced by Geertson and the various related entities including GLLC, and the discussions and negotiations with Bank.  She had not, prior to Christmas Day, been retained to act as counsel in regard to the negotiations.  However, on this hunting outing, she agreed to represent the Geertsons and the entities.

The following day Hart contacted Goodson, who e-mailed to her later that same day a copy of the current version of the settlement agreement, Version 9.[59] The copy of Version 9 attached to the e-mail was a "clean" rather than a red-lined version.  However, Hart's clients had been provided a red-lined copy on December 24 with Goodson's fax.  Hart testified that she reviewed this December 24 letter and the red-line agreement, which she indicated she got from Geertson on Christmas Day, as well as the clean copy she got from Goodson.[60]

---

[59]  Ex. 21.

[60]  Geertson argues that he never received the faxed, red-line Version 9, and Mrs. Geertson testified regarding the physical layout of the "office" at the Home Place, and discussed problems that would occur on occasion with the fax machine and phone lines.  Geertson's contention was that Goodson was lying when he indicated the fax transmission and red-line were
(continued...)

MEMORANDUM OF DECISION - 22

Geertson testified that Hart's review function was limited, and that her

charge and focus was almost entirely on removal of the "joint check" provision on

seed crop proceeds, which Geertson found particularly objectionable.[61]

While Hart agreed that this was one issue (and one she successfully

negotiated out of the final agreement), she testified without qualification that her

review of the agreement and her advice and consultations with Geertson were not

as limited or cursory as he suggests.

Hart indicated that each and every provision of the draft agreement was

reviewed, and that she went over the terms with Phillip and Marilyn Geertson,

explaining what they meant.  She specifically discussed with them the deed in lieu

process, and what would happen should there be a default.

Geertson testified that Hart advised him estoppel affidavits "were just a

bunch of lawyer talk."  Hart flatly denied this, and said she explained the concept

---

[60](...continued)
sent.  This was not proven.  Mrs. Geertson's testimony supports an alternative argument, *i.e.*, that
the transmission was sent, but it never arrived.  However Hart's testimony about obtaining the
faxed letter and red-line version from Geertson was clear.  In the final analysis, though, this
debate seems to relate more to witnesses' credibility than it does to a true legal defense.  The
settlement agreements were long and detailed, and went through multiple drafts.  The parties were
under an obligation to read the final version they executed, no matter what was in any prior draft.
And there is no doubt that Geertson and GLLC were provided a "clean" version of the agreement
after the change to ¶ 5.2 *even if* the red-line version highlighting the changes somehow failed to
be received by the Geertsons' home office fax machine.

[61]  Geertson also testified Hart was to get the exclusion of the Home Place back into the
agreement.  Whether in this regard or that of the joint check provision, Geertson never advised
Bank that Hart's role was limited.  And the contention of limited engagement was rebutted by
Hart.

MEMORANDUM OF DECISION - 23

and operation of the affidavits, and the related deeds in lieu of foreclosure, at some length.

Hart testified that she was concerned over the prospect of a payment of $1.0 million being required within essentially four months.[62]  She read and understood ¶ 5.2 of the proposed agreement as providing that any default, including the April 2004 payment, would be a trigger for release of the deeds in lieu to Bank for recording, and she says she made that fact, and her concern, known to Geertson. She indicated that Geertson said he understood.

Hart negotiated with Goodson, by phone and e-mail, through the end of December and into January.  On January 14, another revised agreement, Version 10, was provided.[63]

Hart was present at the offices of Bank's lawyers on January 16, 2004 when Philip and Marilyn Geertson signed the final Settlement Agreement, Ex. 7.[64] Subsequent to the meeting, complete sets of the fully executed agreements and related documents were provided.[65]  Following receipt of the documents, the

_____

[62]  By this time, it appeared that the agreement would be finalized no earlier than the end of December, 2003, and a $100,000.00 payment would be required on January 9, 2004.  It was the next $900,000.00 payment due on April 30, 2004, that caused Hart the most concern.

[63]  Ex. 25.

[64]  Other parties came to the law offices separately or were mailed the documents to sign.

[65]  *See* Ex. 28 (letter of Jan. 15, 2004 from Bank's counsel to title company, and copied to Hart, re: deeds in lieu and escrow and referencing default consistent with and citing to provisions of ¶ 5.2); Ex. 29 (letter of Jan. 19, 2004, from Bank's counsel to Steve and Lisa Geertson, also

(continued...)

MEMORANDUM OF DECISION - 24

Geertsons did not raise any objections, indicate that there were any errors, specifically object to ¶ 5.2 as incorrect or raise any concerns with the final agreement.[66]

All the parties had just gone through a lengthy, complex and exhausting negotiation process in which several differing approaches to settlement were discussed, and some even tentatively agreed to. None of the earlier approaches or tentative settlements, however, resulted in a final, signed agreement.

All the parties, including Geertsons, knew that until they had come to a final, joint understanding on all the terms, and agreed to it in writing, they had no deal. All had seen prior versions of the agreement, believed to be the final written expression of what had been discussed and agreed, go unsigned and never become effective. Indeed, Geertson had himself decided not to sign and rejected such a prior "final" agreement. This makes the actual execution of the Settlement Agreement, Ex. 7, significant.

So, too, are certain of the provisions of that agreement. One is the Settlement Agreement's integration clause, which provides:

---

[65](...continued)
copied to Hart, with documents for signature and copies of escrow documents and instructions); Ex. 30 (letter of Jan. 28, 2004, from Bank's counsel to Hart with fully executed agreement).

[66] Geertson and GLLC also take issue with how the escrow for the deed in lieu documents was created. *See* Adv. Doc. No. 30 at 5-6. They allege that "[n]either Geertson nor the other Borrowers were provided with copies of the escrow documents at First American Title." *Id.* at 5. However, the assertion is belied by Exs. 28-30 discussed in the preceding note. And no issue regarding the escrows was raised after the agreement was finalized.

MEMORANDUM OF DECISION - 25

This Agreement contains the final expression of the parties with regard to the subject matter hereof. No prior course of dealing, discussions, representations or negotiations between the parties, and no oral or extrinsic evidence of any nature shall be used to supplement or modify any terms of this Agreement. The Borrowers and the Guarantors affirm that no understanding, agreement or representation which is inconsistent or in conflict with the terms of this Agreement has been made by or on behalf of the Bank with respect to the existing defaults under the Loans, or with respect to the subject matter of any of the provisions of this Agreement.

Ex. 7 at 23 (¶ 17.4).

Borrowers only made partial payment toward the $1,000,000.00 due by April, 2004. Bank requested and obtained from escrow the deeds in lieu of foreclosure. Following litigation in other forums, the deeds in lieu for the Idaho and Oregon properties were recorded on June 9 and June 16.[67] GLLC's chapter 11 was also filed on June 16.[68]

## III.   DISCUSSION AND DISPOSITION

### A.   The Motion

The Motion asks for relief in two general ways. First it requests "injunctive" relief of a mandatory nature, *i.e.*, an order commanding GLLC to release the lis pendens that encumber title to the Oregon and Idaho properties.

---

[67] Exs. 8, 9.

[68] The chapter 11 petition was filed at 3:46 p.m MDT on June 16, 2005, according to this Court's CM/ECF records. The deed in lieu for the Malheur County, Oregon properties was filed of record at 3:11 p.m. that same date. *See* Ex. 9 at 11. Vale, Oregon, site of the Malheur County clerk's office, is in the Mountain time zone, thus the recording of the deed in lieu preceded the bankruptcy filing.

MEMORANDUM OF DECISION - 26

Second, Bank wants the Court to enter an order authorizing its sale of these properties "free and clear" of claims of GLLC.[69]

### 1.    Standards for mandatory preliminary injunctions

This Court has the jurisdiction and ability to entertain requests for injunctive relief.  28 U.S.C. § 157(a), (b); 28 U.S.C. § 1334(b).  They are to be advanced by or in an adversary proceeding, *see* Fed. R. Bankr. P. 7001(7), subject to the standards under Fed. R. Civ. P. 65, incorporated under Fed. R. Bankr. P. 7065.  *See generally Richardson v. Runge Fin. Co. (In re Richardson)*, 2003 WL 22670823, 03.4 I.B.C.R. 216, 219 (Bankr. D. Idaho 2003).

In most cases, a motion for preliminary injunction is designed to preserve the status quo and prevent change in circumstances *pendente lite* ("while the action is pending").  "A preliminary injunction is not a preliminary adjudication on the merits, but a device for preserving the status quo and preventing irreparable loss of rights before judgment."  *Textile Unlimited, Inc. v. A.,BMH and Co.,* 240 F.3d 781, 786 (9th Cir. 2001).

---

[69]  The Motion asks the Court to authorize the sale free and clear of the interests of GLLC (*i.e.*, "free and clear of the Debtor's alleged claims and interests").  Adv. Doc. No. 11 at 2.  However, the agreed addendum to the sale proposal between Bank and prospective purchaser Greg Obendorf provided that Bank was not obligated to sell the property if the title dispute was not resolved by December 30, 2005 or if, by that date, "a court order or stipulation by Prior Owners is not entered allowing the sale to proceed free and clear of Prior Owner's claims."  Ex. 12 at 2; Ex. 13 at 2.  "Prior Owners" is defined as "Geertson LLC and related parties."  *Id.* at 1.  The adversary litigation presently before this Court does not address GLLC's related entities or parties, as GLLC is the only named party herein.  Potential issues with the scope of relief available against GLLC under the Motion, and the relief against related parties needed to meet the terms of the Obendorf sale agreement, is rendered moot by the Court's decision on other grounds.

MEMORANDUM OF DECISION - 27

A party seeking a preliminary injunction must demonstrate either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) that serious questions going to the merits exists and the balance of hardships tilts sharply in the movant's favor. *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 602 (9th Cir. 2000); *Richardson*, 03.4 I.B.C.R. at 219 (citing *Am. Motorcyclist Ass'n. v. Watt*, 714 F.2d 962, 965 (9th Cir. 1983)). These are not separate tests. Rather, they are two points on a sliding scale where, as the probability of success decreases, the required degree of irreparable injury must increase in order to support injunctive relief. *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 874 (9th Cir. 2000); *Stanley v. Univ. of Southern California*, 13 F.3d 1313, 1319 (9th Cir. 1994).

The use of the term "serious questions" refers to questions "which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo." *Gidler v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991) (quoting *Republic of Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)).

The Motion herein seeks not just to preserve the present status quo while GLLC and Bank litigate to a final conclusion the several causes in the complaint and the counterclaim. Rather, it seeks to obtain the release of GLLC's lis pendens,

MEMORANDUM OF DECISION - 28

which would presumably allow Bank the ability to sell the Oregon and Idaho

properties even though GLLC's claims to the properties or challenges to Bank's

title under the deeds in lieu remain unadjudicated.  As noted before, to ensure that

such a sale could be consummated, Bank also asks the Court authorize such a sale

"free and clear" of GLLC's interests.

This relief, therefore, appears quite similar to what a final judgment in

favor of Bank would look like.  But even if different in some degree, it is

nonetheless clear that the injunctive relief Bank wants is "mandatory" rather than

prohibitory.  That is, Bank does not wish this Court to enter an order preventing

GLLC from doing something.  It wants an order compelling GLLC to take an

affirmative act – releasing the lis pendens.

In *Anderson v. United States*, 612 F.2d 1112 (9th Cir. 1980), the Ninth

Circuit Court of Appeals stated:

> Mandatory preliminary relief, which goes well beyond simply
> maintaining the status quo Pendente lite, is particularly disfavored, and
> should not be issued unless the facts and the law clearly favor the
> moving party.

612 F.2d at 1114 (quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir.

1976).  Further:

> Courts are more reluctant to grant a mandatory injunction than a
> prohibitory one and . . . generally an injunction will not lie except in
> prohibitory form.  Such mandatory injunctions, however, are not
> granted unless extreme or very serious damage will result and are not
> issued in doubtful cases or where the injury complained of is capable

MEMORANDUM OF DECISION - 29

of compensation in damages.

*Id.* at 1115 (quoting *Clune v. Publishers' Assn. of New York City*, 214 F. Supp.
520, 531 (S.D.N.Y. 1963), *aff'd* per curiam, 314 F.2d 343 (2nd Cir. 1963)).

    *Anderson* was followed in *Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d
1399, 1403 (9th Cir. 1993), where the court observed that mandatory preliminary
injunctive relief "is subject to heightened scrutiny and should not be issued unless
the facts and law clearly favor the moving party."  Similarly, the court in *Stanley*
noted the "higher degree of scrutiny" required, and emphasized that courts should
be "extremely cautious" in issuing a mandatory preliminary injunction because it
"goes well beyond simply maintaining the status quo *pendente lite* [and] is
particularly disfavored."  13 F.3d at 1319-20 (citing, *inter alia*, *Anderson*, 612
F.2d at 1114).

### 2.    Application of standards (likelihood of success)

    Because it is the defendant Bank that seeks the mandatory preliminary
injunction, the Court must evaluate likelihood of Bank's success (a) in defending
the claims asserted by GLLC of fraud and avoidable preference, and (b) in
achieving relief under its counterclaim, here alleging slander of title and trespass,
and seeking damages and eviction therefor.  Because the counterclaim flows
directly from GLLC's complaint and the filing of the lis pendens, the Court

MEMORANDUM OF DECISION - 30

focuses on the likelihood of Bank's success in defending the complaint.[70]

### a.    GLLC's claims of fraud

As implicit in the extended recitation of facts above, the Court finds and
concludes there is a substantial likelihood of Bank's success, and GLLC's failure,
on the issue of Bank's alleged fraud.  There was no affirmative proof of
misconduct, deceit or fraud by any Bank officer, employee or lawyer.  The
specific assertions leveled (secret or other taping of the December 5 meeting,
concealment of changes in draft agreements, misleading communications, etc.)
were not established even in the most preliminary or prima facie sense.  This, in
fact, is so apparent that the Court feels it unnecessary to belabor the application of
the evidence to the elements that must be established to support a finding of
fraud.[71]

GLLC and Geertson also appear to assert in testimony and argument that
the agreements were signed under "duress" and urge this as a ground or basis for

---

[70] Inasmuch as the Court concludes, *infra*, that Bank does not meet the requirements for
entry of a mandatory preliminary injunction despite the probability of its success in defending the
complaint, it need not address the probabilities for its success on the counterclaim.

[71] Those elements of fraud under the common law mirror the elements of § 523(a)(2).
*Younie v. Gonya (In re Younie)*, 211 B.R. 367, 373-74 (9th Cir. BAP 1997), *aff'd* 163 F.3d 609
(9th Cir. 1998).  Those elements are (1) a representation by a party (the debtor in § 523(a)(2)
cases), (2) the party knew the representation was false at the time it was made, (3) the party made
the representation with the intent and purpose of deceiving another, (4) the other party relied on
the representation, and (5) the other sustained loss and damage as a proximate result.  *See*, *e.g.*,
*Diamond v. Kolcum (In re Diamond)*, 285 F.3d 822, 827 (9th Cir. 2001); *American Express
Travel Related Servs. v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125 (9th Cir. 1997); *Bank of
Idaho v. Goodrich (In re Goodrich)*, 04.4 I.B.C.R. 166, 170 (Bankr. D. Idaho 2004).

MEMORANDUM OF DECISION - 31

finding the agreement improper and voidable, even though a cause of action for duress was not pleaded.  The assertion, if entertained, does not hold.[72]

The claim of duress under Oregon law[73] requires proof of three elements: (1) wrongful acts or threats, (2) financial distress caused by the wrongful acts or threats, and (3) the absence of any reasonable alternative to the terms presented. *Oregon Bank v. Nautilus Crane & Equip. Corp.*, 683 P.2d 95, 103 (Or. Ct. App. 1984).  It is clear that "threats to do what the threatening person had a legal right to do does not constitute duress." *Id.*  In *Oregon Bank*, the debtor/defendant's president averred that he signed a document (the terms of which he now wished to avoid) "only out of duress, because [an employee of the bank's assignor] told me that if I did not sign it, [the assignor] would sell me no more cranes, which would have put our company out of business." *Id.*  The Oregon appellate court found that the trial court did not err in concluding that the defense of duress was not supported as a matter of law. *Id.*[74]

---

[72]  In addition to the discussion that follows, the Court notes that the final executed agreement disclaimed any duress.  *See* Ex. 7 at 22 (¶ 17.1).

[73]  Oregon law is discussed because the final Settlement Agreement, Ex. 7, specifically provided it would be governed and construed under such State's law.  *Id.* at 25 (¶ 17.14).

[74]  Interestingly, the debtor/defendant also argued in *Oregon Bank* that equitable estoppel or estoppel by conduct should apply to prevent collection of the subject account.  *Id.* at 102.  The court noted the several elements required for such a defense, and these elements are similar to fraud elements, as implicated in the instant suit.  *Id.*  (The elements of equitable estoppel under Oregon law are (1) false representation made with knowledge of the facts, (2) the other party is ignorant of the facts, (3) the representations are made with intent that they be acted upon, (4) the other party must be induced to so act.  *Id.* at 102.).  The court rejected the assertion because the
(continued...)

MEMORANDUM OF DECISION - 32

Idaho law, with which the parties' counsel might be more familiar, is

consistent.  The Idaho Court of Appeals considered the duress issue in *Saint*

*Alphonsus Regional Medical Ctr., Inc. v. Krueger*, 861 P.2d 71 (Idaho Ct. App.

1992).  It stated:

> An agreement to compromise and settle a dispute is an enforceable contract which supercedes and extinguishes all prior claims and defenses.  In an action brought to enforce such an agreement, made in good faith, the court will not inquire into the merits or validity of the original claim.  The agreement to compromise and settle is binding in the absence of fraud, duress or undue influence.
>
> The Kruegers argue that the termination agreement was induced by economic duress wielded by the Hospital.  A party claiming economic duress must establish that: (1) he voluntarily accepted the terms of the agreement; (2) the circumstances permitted to alternative; (3) the circumstances resulted from the coercive acts of the other party.  Duress must result from the opposing party's wrongful and oppressive conduct and not from the claimant's necessities.  It cannot result merely from the opposing party's insistence on a legal right and the other party's yielding to the insistence.  The defense must be shown by clear and convincing evidence.

861 P.2d at 506-07 (citations omitted).

Nothing in the evidence here comes close to meeting the test for actionable

economic duress.

---

[74](...continued)
debtor's president admitted to signing a written agreement which, along with other materials available to him, contained the subject provisions.  *Id.* at 102-03.  The court noted that there has to be reliance in fact and a right to rely, and that reliance is not justified when a party has knowledge to the contrary.  *Id.*  Obviously, the debtor having signed documents that directly contradicted the position it later advanced was an important factor in *Oregon Bank*.  It's not hard to draw the analogy to the contentions in the present suit, raised by parties who have executed formal and detailed written agreements addressing the very points now in contention.

MEMORANDUM OF DECISION - 33

GLLC and Geertson also argue that the "real" agreement was different than that appearing in the signed Agreement, Ex. 7.

Whether or not a contract is considered to be a final expression of the agreement, or a fully integrated contract, is a question of law. *See, e.g.*, *Sullivan v. Mass. Mut. Life Ins. Co.*, 611 F.2d 261, 264 (9th Cir. 1979) (applying California law). A written contract is considered to be the complete and final agreement where the parties intend the writing to be the sole and exclusive embodiment of the agreement. *Ankeny v. Meyer (In re Ankeny)*, 184 B.R. 64, 70 (9th Cir. BAP 1995) (same). In determining whether a contract is fully integrated, a court should consider: "(1) whether the written agreement appears to state a complete agreement; (2) whether the alleged oral agreement directly contradicts the writing; (3) whether the oral agreement might naturally be made as a separate agreement; and (4) whether a jury might be misled by the introduction of the offered parol evidence." *Ankeny*, 184 B.R. at 70 (citing *Sullivan*, 611 F.2d at 264).[75]

The agreement here clearly meets the first factor. It is precise, detailed and readily appears to set forth a complete agreement. That it was intended to be the final written expression of the total settlement is clear from its own terms, which are exhaustive. Completeness is also established from the context of the negotiations and all the testimony and evidence of the extended process of

---

[75] As there is no jury involved in the adversary litigation before the Court, the fourth factor is inapplicable.

MEMORANDUM OF DECISION - 34

reaching a workout of the subject credit.  Moreover, the final agreement had an "integration" clause.[76]  The existence of the integration clause is itself evidence of the parties' intent and the completeness of the agreement.  *See Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859 (9th Cir. 1995).

In regard to the second factor, Geertson and GLLC do not argue that there was any specific other oral agreement at odds with the written and executed one.[77] Nor do they argue with any fervor that any of the prior Versions was actually "the" agreement.[78]  Rather, they appear to contend that certain terms in the superceded, and unsigned, drafts should be found to be the operative or controlling terms, and that the Court should conclude that the changed terms in the final executed agreement were fraudulently inserted.[79]

The third factor also cuts against GLLC's position.  That the "default" provisions or terms would be subject to an oral or separate written agreement, or be a matter of unresolved negotiation, is not at all "natural" when so much time and effort was taken to comprehensively address all issues regarding the workout

---

[76]  *See* Ex. 7 at 23 (¶ 17.4).  That the final agreement would include such a clause comes as no surprise; the prior drafts all contained one.

[77]  They do not contend, for example, that Bedenbender or anyone else for Bank made an oral "side deal" or an oral agreement different from Ex. 7.

[78]  Even Geertson, in explaining his disavowal of a prior "agreement" that had been reached orally but not reduced to writing *and* signed by all the parties, knew that only the last and signed agreement would be the final and enforceable one.

[79]  They argue, in essence, that ¶ 5.2 should look like Version 9's even though the other changes and Bank concessions found in Version 10 should remain.

MEMORANDUM OF DECISION - 35

of the credit in a single, written and formally executed agreement.

In sum, there is no credible evidentiary basis for determining that anything other than the final signed agreement was the single, complete, fully integrated and enforceable agreement between and among these parties. The idea that prior default provisions should be perpetuated into that final agreement, is belied by the agreement, and the course of conduct and the actions of the parties.

Geertson testified that he did not closely read the final agreement that he, his wife and son signed personally and as members of GLLC. He indicates that had he noted (or had his attorney noted for him) the change in the default term in the agreement he was given, he would not have signed it.[80]

His argument lacks merit. Oregon law is clear that a party's failure to read a contract does not vitiate that execution or excuse performance. *Knappenberger v. Cascade Ins. Co.*, 487 P.2d 80, 83 (Or. 1971); *LB Menefee Lumber Co. v. Gamble*, 242 P. 628, 631 (Or. 1926).[81]

---

[80] There was no similar testimony by the others signing the agreement. Had there been, the resolution of this "defense" to contract enforcement would be the same as discussed in connection with Philip Geertson.

[81] Geertson's propensity to disavow documents of importance signed by him on the basis that he did not read them is troubling. In addition to the subject agreement, the evidence established a similar situation. Geertson signed, along with Marilyn Geertson, the chapter 11 bankruptcy petition in Case No. 05-05759-JDP filed on December 19, 2005. That petition asserted that total assets owned by the joint individual debtors had a value between $0.00 and $50,000.00. *Id.* at Doc. No. 1. Testimony from Geertson elicited by Bank herein established that this assertion was knowingly false. The excuse Geertson offered for this, during his testimony in the instant case, was that he signed the petition as provided by his bankruptcy counsel to him without bothering to review it to see if it was accurate or true, even though his signature appeared
(continued...)

MEMORANDUM OF DECISION - 36

In sum, having considered all the arguments and the facts as established by the evidence, it appears that Bank has a strong and substantial likelihood of success on the merits of the fraud allegations of the complaint.

### b.    GLLC's assertion of a preference

GLLC also complains that the transfer of Idaho and Oregon real property, or of debtor's interest in such property, via the deeds in lieu of foreclosure constitutes an avoidable preference under § 547 of the Code.

To be avoided as a preference, the trustee (here GLLC as debtor in possession[82]) must prove by a preponderance of the evidence that a transfer of property of the debtor (GLLC) occurred and that such transfer (1) was made to or for the benefit of a creditor, (2) for or on account of an antecedent debt, (3) while the debtor was insolvent, (4) within the 90 days before the filing of the bankruptcy petition (or within 1 year for an insider), and (5) that enabled the creditor to receive more than it would have received in a chapter 7 liquidation had the transfer not been made.  *See* § 547(b); *see also Comm. of Creditors Holding Unsecured Claims v. Koch Oil Co. (In re Powerine Oil Co.)*, 59 F.3d 969, 971-72 (9th Cir. 1995); *Crawforth v. H&H Enterprises, LLC (In re Larison)*, 05.3

---

[81](...continued)
immediately below an affirmative statement by him that it was true to the best of his knowledge and belief.  Case No. 05-05759-JDP was dismissed on January 27, 2006, on the motion of the U.S. Trustee.

[82]  *See* § 1107(a).

MEMORANDUM OF DECISION - 37

I.B.C.R. 74, 76, 2005 WL 2179060 (Bankr. D. Idaho 2005) (citing *Elsaesser v.*

*Cent. Pre-Mix Concrete Co. (In re Pioneer Constr., Inc.)*, 01.2 I.B.C.R. 66, 67

(Bankr. D. Idaho 2001)).

Bank argues that there are at least two problems with the assertion of an

actionable preference here.[83]

The first has to do with the timing of the transfer. For § 547(b) purposes, a

transfer is deemed to occur at the time it is made between the transferor and

transferee if perfected within 10 days, or considered to have occurred at the time

of perfection if perfected after such 10 days. *See Hymas v. Am. Gen. Fin., Inc. (In*

*re Chase)*, 00.2 I.B.C.R. 73, 76-77, 2000 WL 33712297 (Bankr. D. Idaho 2000)

(discussing § 547(e)(2)(A), (B)).[84] For a transfer of real property, perfection

---

[83] The Court discusses two in detail but there is a third that can be mentioned. In an apparent attempt to defeat Bank's contention of potential "irreparable" injury, and to bolster the idea that GLLC was injured by the loss of the real property via the "fraudulent" changes to the default provisions of the agreement, and perhaps to help advance their § 547(b)(5) arguments, GLLC attempted to establish that the values of the Idaho and Oregon properties were significantly in excess of Bank's appraised values. Geertson testified by affidavit, Adv. Doc. No. 33, that these properties were worth $5.7 million (the Oregon properties at $4.7 million and the Idaho property at $1.0 million). *Id.* at 3 (¶ 6). His hearing testimony estimated the values of these real properties of between $4 million and $6 million (*i.e.*, between $7 and $9 million total, less the Nevada property held by other than GLLC allegedly worth $3 million). Though GLLC's bankruptcy petition indicated insolvency (*see* Case No. 05-02343-TLM at Doc. No. 1, showing assets of $0-50,000.00 and liabilities of $1-10,000,000.00), Geertson testified that in his opinion GLLC's assets exceeded its liabilities at the time of GLLC's petition. If GLLC was solvent at the time of the preferential transfer (only a matter of days before the petition, if GLLC's timing of the date of transfer is accepted), the insolvency element of § 547(b)(3) cannot be satisfied, and the preference action fails. Some swords are indeed two-edged.

[84] The 10 day period is now 30 days under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 119 Stat. 23 (2005) ("BAPCPA"). The pre-BAPCPA Code applies to the instant litigation.

MEMORANDUM OF DECISION - 38

occurs when a bona fide purchaser of such property from the debtor cannot

acquire an interest superior to the interest of the transferee. *Id.* (discussing

§ 547(e)(1)(A)).

Here the deeds in lieu of foreclosure were executed in January, 2004,

according to the acknowledgments thereon.[85]  They were recorded on June 9, 2005

(Idaho property) and June 16, 2005 (Oregon property).[86]  GLLC's petition was

filed on June 16, 2005.  GLLC argues that the transfers occurred on recording,

presumptively on a theory of perfection under § 547(e)(2)(B) and (e)(1)(A).[87]

Bank argues, however, that the transfer was effective upon execution and

delivery to escrow of the deeds in lieu of foreclosure, well prior to any preference

period.  It notes that under Oregon law deeds in escrow are beyond the control of

the grantor and, absent the grantee's consent, the deed cannot be recalled by the

grantor.  *Foulkes v. Sengstacken*, 163 P. 311, 314 (Or. 1917) (characterizing

depository escrow not as an agent of either grantor or grantee but instead as a

---

[85]  Exs. 8, 9.  Though signed and acknowledged in January, 2004, they were signed
"effective [as of] December 15, 2003."  *Id.*

[86]  *Id.*

[87]  GLLC's complaint, Adv. Doc. No. 1 at 5 (¶ XI), appears to assert that the "transfer"
for § 547(b) purposes was the "transfer of ownership" by the deeds in lieu of foreclosure, though
it does not specify GLLC's position as to whether that "transfer of ownership" occurred when the
deeds were signed and delivered to escrow (in 2003) or when they were recorded (in 2005).
GLLC's brief focuses on the recording of those deeds.  Adv. Doc. No. 30 at 13 ("The transfer
here was the recording of the deeds in lieu in June, 2005.").  The briefing contains no analysis of
§ 547(e) or the cases considering the timing of the transfer.

MEMORANDUM OF DECISION - 39

trustee of an express trust).[88]

This aspect of Bank's argument is intriguing.  Of course, GLLC would likely[89] argue that, because the date of transfer is established by perfection and because perfection is established by reference to a bona fide purchaser under § 547(e)(1)(A), the actual recording of the deeds in lieu of foreclosure as instruments of conveyance[90] is the signal event.  But GLLC's contention is not without its difficulties.  For example, the deeds so important to GLLC in this analysis were and are "in lieu of" foreclosure of the deeds of trust that already encumbered these properties to the benefit of Bank.  Since those deeds of trust were already of record, one might wonder how a bona fide purchaser would be able to acquire an interest superior to Bank's security interest, whether realized upon by foreclosure or a deed in lieu.[91]

---

[88]  Bank also relies on *In re Prairie Crossing, LLC,* 2000 WL 1468755 (N.D. Ill. 2000), for the proposition that placing a deed in lieu of foreclosure in escrow terminates a debtor's "legal" rights and subsequent default (here in 2004) terminates any remaining "equitable" rights.

[89]  As noted, GLLC's briefing on § 547(e) is nonexistent, and that on § 547(b) is not helpful here.  The Court views the indicated argument as "likely" because all other potential dates for transfer under § 547(e) are well outside the preference period.

[90]  *Chase* notes that a transfer of an interest in real property in Idaho are perfected as against bona fide purchasers when the instrument of conveyance is properly recorded.  00.2 I.B.C.R. at 77 (citing Idaho Code § 55-812).

[91]  On the other hand, while GLLC had already transferred an interest in the properties when the deeds of trust were executed and recorded, the question might be what else, if anything, it transferred at the time the deeds in lieu were placed in escrow and/or recorded.  The federal definition of transfer is broad.  *Larison,* 05.3 I.B.C.R. at 78 (citing § 101(54) which defines transfer as every mode, direct or indirect, absolute or conditional, of disposing of or parting with an interest in property).

MEMORANDUM OF DECISION - 40

There is yet another problem with the contention there was an avoidable preference.

The fifth element of a preference is that the subject transfer enabled the creditor to receive more than it would have received in a chapter 7 liquidation in the absence of the transfer. *See* § 547(b)(5). Even if the transfers were deemed to have occurred for § 547(b) purposes when the deeds in lieu were recorded, rather than when they were executed and delivered to escrow, and thus fall within the 90 day avoidance window, it appears this "greater recovery" element may not be met.

Essentially, this element requires that the transfer have satisfied an *unsecured* obligation owed the creditor, in connection with a bankruptcy case that will be unable to pay all unsecured creditors in full. *Larison*, 05.3 I.B.C.R. at 77 (citing 5 Collier on Bankruptcy ¶ 547.03[7] at 547-45 (Alan N. Resnick & Henry J. Sommer, eds. rev. 15th ed. 2002)). Here, the transfer, whether by execution of the deeds in lieu or their recording, satisfied a *secured* obligation.

Bank had deeds of trust against the Idaho and Oregon properties.[92] The deeds in lieu of foreclosure were a contractual alternative means of obtaining and realizing upon that secured collateral. Obviously, in a definitional sense, the sort of deed used here is "in lieu of" the foreclosure of a deed of trust or mortgage.

---

[92] *See* Exs. 8, 9 (each referencing the underlying deed of trust by date, recording date, and instrument number).

MEMORANDUM OF DECISION - 41

The mechanism satisfies *only* the secured obligations.[93]

An issue of the sort presented here was addressed in *Dullea Land Co. v. Ideal Ag Corp. (In re Dullea Land Co.)*, 2001 WL 1892189 (Bankr. D.N.D. 2001), *aff'd* 269 B.R. 33 (8th Cir. BAP 2001).  That court rejected preference contentions leveled against a creditor secured by a mortgage who, within the preference period, obtained the encumbered collateral through a deed in lieu of foreclosure. *Id.* at *5-6.[94]  It found such a creditor does not receive more than it would in a chapter 7 liquidation.[95]

GLLC argues, however, that Bank effectively received "more" through the deeds in lieu than it would have in chapter 7 on the theory that, by becoming the owner of the properties through the deeds in lieu, Bank could proceed to sell them in a "non-distress" sale for full fair market value rather than holding a "foreclosure" sale (which, GLLC argues, inevitably brings a lower return) after

---

[93]  Both parties discussed the concept of the deeds in lieu effecting a realization on the real property collateral, and that unsecured claims would be waived and released in that process.

[94]  *Dullea* does not help resolve the question of when the transfer occurred.  In *Dullea*, the deeds in lieu of foreclosure were recorded on November 9, 2000, and the chapter 11 petition was filed on November 13, 2000.  *Id.* at *1, *2.  The deeds were executed and delivered on August 7, 2000.  *Id.* at *2.  The court's decision did not specifically address the question of the operative transfer date for § 547(b) purposes, though it seems that a November, 2000 transfer was assumed, as August 7 would appear to be more than 90 days before November 13.

[95]  "[A] prepetition transfer to a secured creditor of that creditor's collateral does not result in the secured creditor obtaining more than it would have received in a chapter 7 case."  *Id.* at *5.  The court did note that a different result might attend if the underlying mortgage interest could be "invalidated" as then the transfer might arguably be on account of what would be an unsecured claim when viewed through the prism of a later chapter 7 bankruptcy distribution.  No such contentions were raised there, or in the instant case.

MEMORANDUM OF DECISION - 42

acquiring the properties following stay lift in a chapter 7.[96]

To address the "greater amount" test of § 547(b)(5), the court must "construct a hypothetical chapter 7 case and determine what the creditor would have received if the case had proceeded under chapter 7." *Alvarado v. Walsh (In re LCO Enters.)*, 12 F.3d 938, 941 (9th Cir. 1993).  While "[t]he first four elements of § 547(b) focus on the time the payment is made . . . § 547(b)(5) has been construed to mean that the court must determine the relative positions of the creditors on the date the petition is filed." *Id.* at 942 (citation omitted).  The "hypothetical chapter 7" is not considered in a vacuum, but instead is informed by the actual facts of the case. *Id.* at 941-44; *see also Batlan v. Transamerica Comm'l. Fin. Corp.*, 237 B.R. 765, 770-71 (D. Or. 1999), *aff'd* 265 F.3d 959 (9th Cir. 2001).

The test requires the Court to determine what Bank received at the time of the deeds (June 9 and June 16, according to GLLC's need to fit the date of transfer into the preference window).  It must also determine what Bank would likely receive had the transfer not occurred and Bank sought to recover on its claim in a hypothetical chapter 7 on roughly the same date.  Had the transfer of the deeds in lieu not occurred, GLLC would have held title to the Idaho and Oregon properties

---

[96] *See* Adv. Doc. No. 30 at 14-15.

MEMORANDUM OF DECISION - 43

on the June 16, 2005 petition date,[97] though the same would have been subject to the deeds of trust in favor of Bank.  The question, obviously, goes to the value of the real property.

Bank's valuation evidence was based on the analysis, detailed written report, and testimony of appraiser Ken Brush.  It was competent and credible. Brush concluded that GLLC's real properties in Idaho and Oregon had an aggregate fair market value of $2.2 million and a liquidation value of $1.8 million, and his conclusions were adequately supported.[98]  He noted a marketing period of perhaps a year would be required to realize the fair market values on the properties.  He also testified that there was no assumption made that a bulk or group sale would occur, and that he assumed at least three separate parcel sales would be likely for the Idaho and Oregon properties, which would in his view maximize value.  The liquidation values, he opined, would reflect a discount given a reduced period of market exposure and a forced sale.

GLLC relied on two sources for its valuation.  One was Philip Geertson's testimony which, as noted earlier, had placed values of between $4 and $6 million

---

[97]  The real property would be virtually all of GLLC's assets in the case.  GLLC's schedules disclosed no assets in its filing other than the "equitable" interest in the real properties and $90,000.00 of "leases" shown on its schedule B.  Ex. 33.

[98]  *See* Exs. 11, 31.

MEMORANDUM OF DECISION - 44

for the real properties in Idaho and Oregon.[99]  The other opinion was offered by a

broker, Edison Dee Childs, who had been retained by Geertson in August, 2004 to

market the Oregon properties with a proposed selling price of $2.9 million.[100]

Neither approach to valuation was as thorough as Brush's.

  In evaluating what was received in transfer or what would be received in a

liquidation, Bank's debt must also be considered.  Bank's total debt at the time of

the petition, June 16, 2005, was $4,936,957.77, without inclusion of legal fees.[101]

  Under Brush's values, Bank recovered through deeds in lieu property worth

$2.2 million (once marketed and sold) in partial satisfaction of a $4.9 million

dollar debt.  Had the transfer not occurred, GLLC would have had retained the real

property, but that real property would have remained fully subject to the deeds of

trust securing claims far in excess of its value.

  Using Geertson's values, Bank obtained real property via the deeds in lieu

---

[99]  Geertson's values are a moving target.  In an affidavit, he valued the Oregon properties at $4.7 million.  Adv. Doc. No. 33 at 3 (¶ 6).  In testimony, the values he suggested for the various Oregon parcels totaled $5.5 million.  Similar variations were present on the Idaho property (with the affidavit indicating $1 million and the testimony suggesting $1.4 million), and the Nevada property ($2 million in the affidavit and $3 million in testimony).

[100]  *See* Exs. A, C.  This asking price is only slightly higher then Brush's estimated fair market value, and is well shy of the approximately $4.7 to $5.5 million Geertson testified the Oregon properties were worth.  Nor does this marketing and sale process address the several million dollars Geertson now says could be obtained by developing gravel deposits.

[101]  Ex. 36 at 2.  Bedenbender testified that fees exceeded $100,000.00.  With additional interest after bankruptcy, the debt would increase to almost $5.8 million by the December, 2005 hearings.  *Id.*  GLLC's schedules, though characterizing Bank's debt as contingent, unliquidated and disputed, used a figure of $4.8 million.  *See* Ex. 33 at schedule D.

MEMORANDUM OF DECISION - 45

which might bring as much as $6 million in a non-distress sale process.  Absent

the transfers, GLLC would own properties worth $6 million, subject to a secured

debt to Bank of $4.9 million as of bankruptcy.  But, under § 506(b), such a fully

secured debt would increase with post-petition interest.  Bank established that by

December 7, 2005, the claim, with accrued interest, was approximately $5.8

million, and accruals continued at about $1,500.00 per day.[102]

GLLC's schedule of secured creditors also includes MONY Life Insurance

Co. at $485,710.68 and real property taxes aggregating $23,700.37.[103]  Even if one

assumes that a chapter 7 trustee would seek to market and sell the properties in

such a fashion as to realize the "full" Geertson-estimated values, he or she would

be unable to generate a potential return for creditors other than secured creditors.

Abandonment or stay termination under § 362(d) appears likely.

In such a situation, Bank would be entitled to proceed with foreclosure.

That it would in some fashion satisfy MONY and the taxes to preserve the ability

to recover on the credit is virtually certain.  Once it did, it could proceed to sell the

property in the same fashion as it now can under the deeds in lieu.

So, while the value of the Idaho and Oregon properties is in some dispute,

none of the valuations would support the conclusion that Bank got anything more

---

[102]  Ex. 36 at 2.  In the two months from December 7, 2005, to February 7, 2006, another
$90,000.00+ in interest has accrued.  Section 506(b) also allows for recovery of reasonable
attorneys' fees and costs, adding, per Bank, at least another $100,000.00.

[103]  Ex. 33 at schedule D.

MEMORANDUM OF DECISION - 46

than the value of its collateral; it simply got it by agreed deed rather than through foreclosure. GLLC has not shown how a secured creditor receives a preference if it recovers only its collateral.[104]

In all, therefore, it appears there is also a substantial likelihood of Bank's success in defending this aspect of GLLC's complaint.

### 3.    Application of standards (irreparable injury)

Entry of a mandatory injunction requiring GLLC to remove the lis pendens achieves one if not the primary result sought by Bank in this suit. Should Bank be given the winner's laurel before the race is even run? Such a result would truly be "extraordinary" relief. Can it be justified merely because it is likely – even substantially likely – that Bank will eventually win?

The answer must flow from something other than just the outcome predictive abilities of the Court. Under the cases, it appears this something is irreparable injury.

Bank justifies its Motion by noting that, absent the removal of the lis pendens and its consequent ability to proceed at this time, it will lose a favorable

---

[104] GLLC's position takes *Ehring v. Western Comm. Money Ctr. (In re Ehring)*, 900 F.2d 184 (9th Cir. 1990) and postulates that the non-distress value Bank is likely to receive after the deeds in lieu will be "more" than its ultimate recovery through a bankruptcy liquidation and forced sale, thus showing that it received a preferential payment. GLLC stretches *Ehring* well beyond the facts of that case. In *Ehring*, for example, it appeared that without the allegedly preferential transfer, the estate would sell the subject property, pay the secured creditor "in full" in cash, and distribute the balance of the value to other creditors. The "hypothetical chapter 7" scenarios here appear different.

MEMORANDUM OF DECISION - 47

sale of the Idaho and Oregon properties (as well as the Nevada properties) for an amount approximating appraised value and without any marketing or sales costs. Bank notes that this sale is time-sensitive, and needs to proceed no later than the end of 2005.[105]

The Obendorf offer was received in August, 2005. It offered a price of $2,600,000 for the real estate in all three states and for farm and seed mill equipment.[106] Bank responded to the offer with a proposal of $3,200,000.00 subject to conditions including: (a) Bank would pay a 2.5% commission to the broker; (b) Obendorf must prove his ability to fund; (c) there would be a limitation on the scope of the equipment included, which would be sold "as is"; (d) the closing would not be before December 30, 2005 unless Bank agreed to an earlier date if a resolution over title issues regarding the real property and equipment was reached; and (e):

> Seller [Bank] is not obligated to sell the Real Property or Equipment to Purchaser [Obendorf] if by December 30, 2005, the dispute over title to the Real Property and Equipment is not resolved, whether by court order or otherwise, or if by December 30, 2005 a court order or stipulation by Prior Owners is not entered allowing the sale to proceed free and clear of Prior Owner's claims[.]

---

[105] Bank characterizes the proposed sale as "a momentous feat that should not be thwarted by the Geertson's tactics in this case." Adv. Doc. No. 12 at 3. It argues further that if not granted injunctive relief the harm would be "immediate and real" and, "if this sale is lost, it will be difficult to find another purchaser, and [Bank] will not net the proceeds that it will net from this sale[.]" *Id.* at 24.

[106] *See* Ex. 12 (Oct. 3, 2005, letter to broker Prater re: offer, clarifying terms).

MEMORANDUM OF DECISION - 48

Ex. 12 at 2.

This counterproposal was accepted, with the change of the purchase price to $3,000,000.00 and the elimination of the 2.5% commission.[107]

The time sensitive nature of the sale, which is offered as a reason for finding a potentially irreparable injury, is thus Bank's own creation.[108]  No evidence was presented that the offeror, Obendorf, would lose interest in the potential acquisition if the bankruptcy litigation process required more time.

There was some evidence, though not compelling evidence, that the value of the property which could be realized would diminish, or that Bank in some other sense would be unlikely to achieve as much in liquidation of the real property, if Bank were required to await the conclusion of the litigation.

To be sure, there might be expenses incurred in the maintenance and care of the property pending completion of the suit and ultimate liquidation of the properties.  And there might be marketing expense incurred.  However, the magnitude of such future expenses was not established with significant detail.  Ultimately, whether these additional expenses cause injury depends on the both

---

[107] Ex. 13.

[108] Bank's arguments appeared to indicate the condition was externally imposed by the offeror.  *See, e.g.*, Adv. Doc. No. 12 at 24 ("[Bank] *has . . . received a written binding offer* of $3,000,000 to purchase all of the [Idaho and Oregon] real property, plus the personal property and the Nevada real property, *on the condition that* [Bank] has the dispute resolved and receives a Court order authorizing the sale . . . no later than December 30, 2005.").  *See also* Adv. Doc. No. 16 at 8 (¶ 16).

MEMORANDUM OF DECISION - 49

the size and duration of expenditures, and the final price obtained for the

properties.

The Court appreciates Bank's argument that GLLC is without significant

assets other than the real property[109] and that if the outcome of the suit is favorable

to Bank, it may have no recourse in collecting damages from GLLC.[110]  Under the

cases, this is a potential factor in favor of mandatory preliminary injunction.[111]

Nevertheless, mandatory injunctive relief is extraordinary and to be applied

only in extreme cases, following close and careful scrutiny.  Under all of the

evidence, and in the exercise of its discretion, this Court finds the entry of

injunctive relief of the sort sought herein to be unwarranted.[112]

---

[109]  *See* Ex. 33 at summary of schedules and schedules A and B, showing real property of unknown value and $90,000.00 of accounts receivable related to "leases."  Even though schedule G of GLLC's filing shows no leases, *see id.*, a motion was filed by GLLC in Case No. 05-02343-TLM, Case Doc. No. 11, indicating GLLC's desire to assume lease of the Idaho and Oregon properties between GLLC as lessor and Geertson Farms, Inc. as lessee.  That motion was subsequently withdrawn.  *See* Case Doc. No. 19.

[110]  Here, the Court is concerned with the litigation with GLLC.  It has not attempted to fully evaluate Bank's possible rights against other obligors under the several agreements and guaranties, nor evaluate the potential recoveries against non-GLLC assets.

[111]  *In re Ferdinand Marcos*, 25 F.3d 1467, 1477-80 (9th Cir. 1994) (addressing possibility of an injunction where movant would have an "inadequate remedy" due to opponents' lack or dissipation of assets).

[112]  One final problem with the Motion should be mentioned.  The Motion seeks not just an order requiring GLLC to remove its lis pendens.  It also asks the Court to enter an order allowing Bank to sell the properties "free and clear" of liens and interests of Debtor.  The predicate for that relief is not clearly established.  Moreover, the Obendorf sale agreement – which forms the basis for the idea that sale now rather than later is key to protecting Bank and preventing irreparable injury – requires Bank to resolve all the disputes over title to the real and personal property to be conveyed.  No proof was presented that Bank has resolved or can timely resolve these disputes with the other individuals and entities that compose the "Prior Owners"

(continued...)

MEMORANDUM OF DECISION - 50

## IV.    CONCLUSION

Upon the foregoing, the Court concludes that the Motion shall be denied.

The findings and conclusions orally stated are adopted and incorporated by

reference, and supplemented by this more complete analysis.  An appropriate

order will be entered by the Court.

DATED:  February 15, 2006

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

---

[112](...continued)
even if the GLLC issue were to be resolved by this Court.  The other entities and individuals are
not party to this litigation.  Moreover, the GLLC chapter 11 case and this related adversary
proceeding do not support this Court's opining as to questions concerning the Nevada property or
the personal property assets.

MEMORANDUM OF DECISION - 51